## Abner Walker *v.* The State.

1. PRACTICE. — But twenty-nine of sixty of a special *venire* ordered having been served, and the sheriff's return as to the remaining thirty-one being "not found," and no exceptions having been taken to the special *venire facias*, the manner of service, nor to the return of the sheriff, it is *held* that the court did not err in requiring the defendant to announce; but this ruling must be held in the future in subordination to the provisions of the

Revised Code of Criminal Procedure, arts. 605–617. See the opinion for the subject discussed.

2. MURDER.—Evidence that a person other than the accused threatened to take the life of the deceased, before the homicide, is not admissible in behalf of the accused.

3. SAME—IMPEACHMENT OF A WITNESS. — That the witness has made statements out of court contrary to his evidence on the trial is a recognized mode of impeachment, yet it is only in such matters as are relevant to the issue that the witness can be contradicted; and it is the general rule that this can only be done, in case of verbal statements, by directing the attention of the witness to the time, the place, and the person to whom he made the contradictory statements.

4. ALIBI—CHARGE OF THE COURT. — The court charged for acquittal "if the defendant was, at the time of the killing, at a different place from that at which such killing was done, and therefore was not, and could not have been, the person who killed the deceased, if he was killed. If the evidence raises in your minds a reasonable doubt as to the presence of the defendant at the place where the deceased was killed (if killed), at the time of such killing, you will find him not guilty." *Held* to be a correct and sufficient charge upon the subject of *alibi*.

5. CHARGE OF THE COURT. — See the opinion for charge of the court upon the questions of the credibility of witnesses, the weight of evidence, and of impeaching evidence, *held* properly given.

6. SAME— CIRCUMSTANTIAL EVIDENCE. — "If, on consideration of the evidence, there is any reasonable hypothesis consistent with the facts proved to your satisfaction, and inconsistent with the guilt of the defendant, he should be acquitted," was a charge properly given on the subject of circumstantial evidence.

7. NEW TRIAL. — A new trial will not be granted to enable the accused to show that a witness who testified for the prosecution entertained ill-feeling towards the deceased, and had an interest in convicting the accused.

8. SAME. — A new trial will not be granted in order to enable the accused to impeach a witness who testified against him.

9. FACT CASE. — Note evidence held sufficient to sustain a conviction for murder in the first degree.

APPEAL from the District Court of Falls. Tried below before the Hon. L. C. ALEXANDER.

The indictment, filed September 2, 1878, charged the appellant with the murder of George Heaton, in Falls County, Texas, on the ninth day of April, 1878. His trial was concluded on the nineteenth day of March, 1879, resulting in his conviction of murder in the first degree.

As conducive to a more thorough understanding of the opinion, a comparatively full *resumé* of the evidence, which is contradictory and interesting, is appended.

Mrs. Eliza Walker, the mother of the appellant, was the first witness introduced by the State. She deposed that she has been a widow for about twenty years. She was living in Falls County, Texas, on Brushy Creek, on the ninth day of April, 1878. Walker's Tank, the scene of the tragedy, lies about one-quarter of a mile from the house of the witness. For nine years, or during her residence in Falls County, the witness had owned a stock of horses and cattle, and had known of no one claiming them adversely to her. Some of the stock ranged about and near her house. A short time before the homicide, witness heard that some of her children, including the defendant and Matt Walker, were setting up a claim and talking about suing for their father's part of the stock. Witness sent for the defendant when she heard that he was claiming that himself and the other children were setting up a claim to one-half the stock, and proposed a compromise to him, which he rejected. Witness subsequently sold the stock (reserving a few each of horses and cattle) to the deceased, who lived about two miles distant from her. Deceased was to gather the stock, and did commence to gather them on the ninth day of April, 1878. Witness did not, however, see him on that day; nor did she see him after he was killed. She was inside of her house about four o'clock, P. M., on that day, and heard no report of fire-arms.

Witness's son, George Walker, and her grandson, George Lowe, were hired to deceased to assist in gathering the stock. The country between witness's house and Walker's Tank is open, with the exception of a few scattering trees; and the water in the tank, when it is full, can be seen from the house of witness. Eliza Wyers lived at her house on April 9, 1878. Defendant lived about one mile distant from witness.

George Walker deposed, for the State, that he was the son of the last witness, Eliza Walker, and lived at her house on the day of the homicide. The witness, who was engaged in gathering stock for the deceased, commenced that work on the eighth day of April, 1878, and deceased commenced the next day, April 9th. He saw the deceased on the last-mentioned day, and was with him from about one until about three o'clock, P. M., when he left him. The next that witness saw of him, he was near the herd, at which time some one trotted up behind him and shot him. The deceased was then about one-half mile from the house of Mrs. Eliza Walker, and about one hundred and fifty yards from the tank. Witness was in open view, on the gallery of the house mentioned, which stands upon an elevated place. Saw the deceased fall from his horse, when shot. The party who did the shooting galloped off east, towards Big Creek, and was riding a dark-colored horse. Witness went to the deceased, who was lying on his side, having been shot in the back. He lived about fifteen minutes after witness reached him. Witness knows that Mrs. Eliza Walker had sold her stock to deceased, and knew that defendant and Matt Walker were not willing to the sale, but had never heard defendant say what he would do if the deceased bought the stock. George Lowe was herding horses, about fifty or one hundred yards from the deceased, when the shooting took place. The deceased was coming south-east, riding one and leading another of his horses, at the time he was killed. All of which occurred in Falls County, Texas.

Cross-examined, the witness stated that he met the deceased about one o'clock, and left him about three, going immediately to the herd, and from there to the house. Deceased was killed about four o'clock. Saw no one about but deceased and his assailant, but could not tell whether assailant was white or black. His clothes looked dark to the witness, from where he saw him. Heard the report of the pistol, and went in a gallop to the deceased. Witness

asked deceased who shot him, and he replied that it was a negro, riding a black horse, but he did not know him. When witness first got to the deceased, he reached out his hand, and said, " George, I am shot ; a negro did it." The defendant lived in the neighborhood, and the deceased knew him well. Witness knows both the defendant and his horses well.

Reëxamined by the State, witness says that he saw the shooting. The deceased had his back towards the party who did the shooting, and witness did not see the deceased look back. His horse jumped as the pistol was discharged, and he fell to the ground immediately. Witness did not see the defendant that day.

George Wyers, for the State, testified, substantially, that he lived in McLennan County, five or six miles from Walker's Tank, when deceased was killed. Witness is a son-in-law of Mrs. Eliza Walker, and knows of the sale of the stock by Mrs. Walker to deceased. Defendant and his brothers, Matt and John, opposed the sale, claiming an interest in the stock. Witness had heard the defendant say that he had a petition to replevy the stock, but that he couldn't do it, and that if deceased ever undertook to handle the stock in any way, he (defendant) would kill him. About a week before the homicide, the defendant came to witness, on Brushy Creek, there being no one else present, and asked him to sign the petition, saying that witness's wife was also interested. Witness declined. About two weeks before the homicide, witness being at old man Wyers's, met the defendant, who said, then and there, that he was going to kill deceased that evening, and wanted witness to go with him for that purpose.

About three weeks previous, the defendant came to witness's house, and proposed that witness should get a negro to kill the deceased, and that he would then kill the negro. Matt Walker stayed at the witness's house, the day of the homicide, from about nine o'clock until after

dinner.   Defendant at that time wore a mustache and a small goatee.

Cross-examined, the witness says that the first time the defendant talked to him about killing the deceased was about three weeks before the homicide, and the last time was about a week before the deceased commenced to handle the stock.   There is good feeling between witness and defendant.   Witness has testified in regard to this matter before.   Does not recollect whether, or not, he then told that defendant tried to get him to hire a negro to kill deceased, agreeing to kill the negro himself afterwards. Deceased and witness were friendly.   In answer to question of counsel, witness said that he had never received compensation from persons interested in the prosecution, and had never made threats against the deceased.

Mrs. Eliza Wyers testified, for the State, substantially, that she had heard defendant say that he would kill the deceased if he bought the stock.   (Witness is the wife of the last witness, and sister to defendant.)   The statement alluded to was made at witness's house, about a month before the homicide, and, witness thinks, in the presence of Tinker. Witness was at home when the deceased was killed, but went over to her mother's next morning, and found young John Walker's wife there.   Defendant said that if any one came to Marlin and testified against him, he would kill them, or have them killed soon after, or before they could get away.   This was said in May.

Cross-examined, the witness says that, at the time of the conversation referred to, her husband and Caroline Church were present.   Witness does not know that her husband and defendant are unfriendly.   Had never heard her husband say that he intended to break the deceased's neck.

George Lowe was the next witness introduced by the State.   He testified, in substance, that he was in the employ of the deceased at the time of the killing, and was herding the stock which the deceased had bought from Mrs. Walker,

about one-half mile from the house, near the tank.    While deceased was approaching the herd that evening, riding one and leading another horse, some one rode rapidly up behind and shot him.    The horse he was riding pitched and threw him off.    On being shot, the deceased called witness, and witness went to him, but presently left him, and went to the house ; he was then alive.    The man who did the shooting was riding a brown animal, which witness thinks he has seen before, and which witness believes to be old John Walker's brown mare.    The man who did the shooting had a mustache and goatee, and was black.    He was about the size of defendant ; his beard was of about the same size ; and he wore a black or a white hat, witness does not remember which.    The next time witness saw the defendant he had a mustache and goatee, just like those of the man who killed the deceased.    Witness thought he saw the defendant pass him that morning, about eleven o'clock, and he looked then like the man who killed the deceased later in the day.    The man who shot the deceased looked like defendant, and rode like him.    The weapon used was a nickel-plated pistol.

Cross-examined, the witness says that the country about the tank is open, there being only a little brush in that section, about a mile from Big Creek.    The man who did the shooting came from towards Big Creek, and after the shooting went back that way.    It was a white man who did the shooting, but he was blacked ; he was "right black from putting blacking on him."    Witness took him to be the same man who passed him in the morning, and he was blacked on both occasions.

The substance of the testimony of George Welle was that, on the morning after the homicide, as two men, armed with guns, approached his store in Marlin, the defendant, appearing very much excited, stepped into the store, called for and took a drink.    He took a second drink immediately after swallowing the first, and stepped out of the back door,

where he remained only a few moments before returning and taking a third drink. He then asked witness if he had some flour, and being shown some in a dipper, took it and rubbed it nervously over the backs of his hands. He then asked witness if he had no better flour. Being shown some from a fresh sack, in the same excited manner he rubbed it over his face, but bought no flour that day. Some fourteen days afterwards the defendant returned to witness's store and bought a sack of flour, and still seemed to be laboring under excitement.

F. J. Read's testimony was, in effect, that while standing on the streets of Marlin, on the day after the murder, he had an opportunity of examining the defendant, who stood near. He noticed about his neck dark, greasy looking spots. Witness, when a boy, had practiced blacking for amusement, and says that the dark, dirty looking substance on defendant's neck, he thought, was blacking not well washed off.

Cross-examined, witness says that he is seventy-one years old, and, while he can neither read nor write without his glasses, can see as well as ever at a short distance.

Boone Ritchie, a brother-in-law to defendant, who lived some four or five hundred yards from him, testified that he passed by defendant's field about seven or eight o'clock on the fatal day, and saw him ploughing in his field. He was ploughing two horses. Returning that way in about one-half hour, witness noticed that defendant had left his field, taking one of the horses; or, at least, but one horse was left in the field. Afterwards, witness saw the other horse standing at defendant's gate, evidently tied. Saw no more of defendant that day, nor did he see the deceased that day at all. Had never heard Wyers express himself as hostile to either the defendant or the deceased. Here the State rested.

The substance of the testimony of Holmes Hammett, for the defence, was that he was in defendant's employ at the time of the killing. The two, defendant and witness, went early to work in the field; but about nine o'clock the defend-

ant quit, telling witness that he was going to Morgan's Point, to hunt some horses he had running about there; that he would spend the night at Grant's, and go on to town next morning to attend a justice's court, before which he or Boone Ritchie was to be tried for having had a fight. He rode off on a bay horse, — one that he had been using in the plough, — and wore yellow ducking pants and a light cottonade coat. Witness saw no more of him until he returned next evening, riding the same horse and wearing the same clothes. He owned a nickel-plated pistol, but did not take it with him that day. Witness is positive on this point, for he knows that on his suggestion defendant locked the pistol up in his trunk, to keep it out of the reach of the children about the house, who would handle it whenever they got a chance. The cross-examination did not affect this testimony, and developed, in addition, only that about twelve o'clock on that day old John Walker and his son John came to defendant's house, but left no message for him.

In substance, J. A. Grant testified, for the defence, that between sundown and dark on the fatal day, the defendant came to his house, and displayed no excitement whatever. He remained all night, sleeping with witness in the same room. He slept very soundly, snoring so loudly that, disturbing witness, he had to shake him three or four times during the night. Does not remember the kind of clothes or hat that defendant wore, but knows that he ordinarily wore a white hat. After defendant had reached witness's house, young John Walker came up and brought the news of the killing, and, saying that he had to have assistance, asked witness to go with him; but witness declined, as he was sick himself, and his wife was in an interesting condition. Defendant also declined; for the reason, as he said, that, having been horse-hunting that day since nine o'clock, he was tired, and besides, that he had to be in Marlin next day to attend the justice's court.

Before going to supper that night, the defendant bathed his face and hands in a clean bowl that was used by witness and his wife, and dried on a clean towel. Witness used the same bowl and towel that night, and both defendant and witness used the same the next morning. Witness did not see in the bowl, or on the towel, any evidences of blacking or smut. The defendant left witness's house, going to Marlin, the next morning about one-half hour by sun. Witness sent by him for his mail, and some whiskey. He returned by the witness's house, bringing the whiskey and mail, about the middle of the day. Witness lives about midway between defendant's house and Marlin, and immediately on the road leading from one place to the other. Thinks the defendant rode a bay horse that day. The cross-examination resulted in no further developments. The witness stated, however, that if defendant had a pistol, he did not see it.

N. Dial substantially testified that, on the morning after the killing, himself and Ferney Green stepped into Rickelman's saloon, in Marlin, to get a drink. As they did so, they saw the defendant ride up and hitch his horse. Having heard that defendant was suspected of having perpetrated the murder, in the disguise of a black, witness proposed to invite him in to drink, and suggested to Green to observe him with the view of detecting evidences of the blacking, if any remained. Defendant stepped up to the bar, near the party, and, though the witness observed him closely, he could see no evidences of his having been blacked.

Cross-examined, witness said that himself and deceased were good friends; that he regarded his murder as an outrage, and would have "fastened" on any man whom he knew to have committed the murder. Witness invited defendant to breakfast with him. About that time he heard an uproar at Reàd's Hotel. The dogs that had been taken out by the sheriff's posse to track the murderer were barking, and witness thought, from the way they came, and the

way the defendant came, and from the suspicion which rested upon defendant, that they were on his trail, and for that reason ordered him to leave the house, telling him that he believed the dogs were on the track of the murderer. Defendant answered, "You are mistaken; if the dogs are after the man that killed Heaton, they are not after me." Defendant left, when ordered the second time, and went towards Read's Hotel, leading his horse.

Mrs. Dial, wife of the last witness, observed defendant closely as he ate his breakfast that morning, but did not detect any evidences of smut or blacking about his person.

The witness Gross testified, in substance, that on the day of the murder, at about three-quarters of an hour by sun, — nearly night, — he met the defendant, several miles distant from Walker's Tank, going in the direction of Grant's house, which was some two miles distant from where he met him. He was riding, witness thinks, a bay horse. Witness met an old woman named Read, that evening, near the railroad, and not far from Perry's Switch.

The substance of Wallace's testimony was, that he saw the defendant late in the evening of the day of the murder, three or four miles from Marlin, and where he (witness) was herding sheep for Dr. Elam.

Cross-examined, the witness does not recollect that he told any one that he met the defendant that evening, unless he may have mentioned it to his son-in-law; and if so, it was brought about by hearing that defendant was accused of the crime. Was sick at the former trial of this case, and did not testify; is averse, at best, to mixing up in affairs of this character. Thinks, though not certain, that defendant was riding a bay horse on that occasion.

Mrs. Read testified that she saw the deceased about an hour and a half by sun, on the fatal evening, near Perry's, and some six or seven miles from Walker's Tank. He was riding a small bay horse, and wore light-colored clothes of some kind.

Cross-examined, the witness denied that, upon the suggestion of Mr. or Mrs. Brookshire that defendant was suspected of the homicide, she had said she knew nothing about it, and was glad of it. If such suggestion was made, she does not remember it; and knows that she did not use the language imputed to her, or its equivalent.

The substance of John Walker's testimony was, that he owned a certain brown mare. He left the mare at home on the day of the homicide, and found her there when he returned, late in the evening. Does not know for certain that she was at the house at half-past two or three o'clock in the day, when he went back for a few minutes, but knows she was there late that evening and that night. Witness was at Matt Walker's about two hours by sun; and while there, a negro, who gave his name as Ben, rode up on a black horse. The horse was blowing hard, was wet with sweat, and seemed to be much fatigued. This negro came up to Matt Walker's, about three or three and a half miles from the tank, about one-half hour by sun; remained there talking some minutes, and then rode off in the direction of Brooks's.

The wife of this last witness testified that the mare spoken of was at home all day on the day of the homicide.

Jesse Webb, for the defence, testified that he saw the mare in John Walker's pasture about two o'clock, P. M., on the day of the murder, and corroborated the testimony of John Walker concerning the negro Ben, who was alleged to have come up to the party at Matt Walker's house.

John Walker, Jr., and William Walker, testified that the mare was at home all day, the day of the murder. Both saw her in the field, into which she had jumped from the pasture.

Clete Calvert and Ferney Green corroborated the testimony of N. Dial as to the defendant being invited into Rickelman's saloon, in Marlin, and taking a drink. Both, on Dial's suggestion, observed him closely, and could detect no smut or blacking on his person.

Caroline Church and Tom Brown both knew a negro man named Ben, and both saw him a day or two after the killing. When seen by Tom Brown, he was riding a black horse, and had two army-sized six-shooters. This witness purchased one of the six-shooters from him, paying $6 for it. Witness saw Ben in Marlin on the day he was testifying.

Here the defence closed.

In rebuttal, the State introduced George J. Elam, who testified that Wallace's (a witness for defence) reputation for truth and veracity, in the neighborhood in which he lived, was bad. To the same effect, with regard to the reputation of the defendant's witness Mrs. Read, Mrs. Crawford and Mr. Brookshire testified. This last witness testified that, about seven or eight days after the homicide, Mrs. Read said, in his hearing, that she knew nothing about the matter, and was glad of it. This remark, the witness said, was made in reply to his remark that defendant was accused of the crime.

*Oltorf & Preston,* for the appellant. The statute, in all capital cases, requires that a special *venire facias* shall issue under the order of the court for not less than thirty-six nor more than sixty persons, to appear before the court at a day named in the writ, from whom a jury for the trial of such case is to be selected.

It would seem, then, from the language of this statute, that at least thirty-six persons, duly drawn by the clerk, etc., from which to select a jury, should be before the court before the defendant could be required to announce ready, or not ready, for trial. The object and purpose of the law evidently is, that a defendant in a capital case shall have a larger number of persons from whom to select his jury than defendants in ordinary cases of felony.

In this case there were but twenty-nine of the sixty persons drawn on the special *venire* summoned by the sheriff. Suppose but five, or any number less, had been summoned,

could the defendant be put on his trial, and compelled to take the risk of " picking up " a jury as the convenience of the sheriff might suggest? It has been said by this court, as well also the Supreme Court, that the object in serving the defendant with a copy of the names of persons is to better enable him to challenge such persons as might appear objectionable. In cases where there have been less than one-half of the persons drawn summoned by the sheriff, this right is to a great extent taken away from the defendant.

In criminal causes depending alone upon circumstantial evidence, and where the State has shown that the defendant had made threats against the deceased before the killing, it is competent to show that other parties made threats to kill deceased, and such other parties had as strong motives urging them to the commission of the act as the accused, and particularly the prosecuting witness.

Mr. Wharton says: " Several considerations, however, have already been adverted to, which divert the applications of evidence of antecedent preparations, and which apply with equal force to this head. In addition to these, it is important to observe: 1st. The words supposed to be declaratory of criminal intention may have been misunderstood or misremembered. 2d. It does not necessarily follow, because a man avows an intention, or threatens to commit a crime, that such intention really existed in his mind. The words may have been uttered through bravado, or with a view of intimidating, or annoying, or other collateral objects. Thus, a man such as Dr. Parkman may have frequently been the object of threats or curses of this kind, from irritated tenants, and yet it was from a man who used neither that his death proceeded. Another person, really desirous of committing the offence, may have profited by the occasion of the threat to avert suspicion from himself. A curious instance of this is given in Causes Celebres, 437. A woman of extremely bad character and violent temper,

one day, in the open street, threatened a man who had done some thing to displease her, that she would ' get his hams cut across for him.' He was found dead a short time afterwards, with his hams cut across. This was, of course, sufficient to excite suspicion against the female, who, according to the practice of continental tribunals at that time, was put to the torture, confessed the crime, and was executed. A person was, however, soon after taken into custody for some other offence, who confessed that he was the murderer; that, happening to be passing when the threat was uttered, he conceived the idea of committing the crime, as he knew the woman's bad character would be sure to tell against her. 4th. It must be recollected that the tendency of a threat or declaration of this nature is to frustrate its own accomplishment." Whart. Cr. Law, 340, 341.

Mr. Wharton, on p. 442, again says: "It remains now only to observe that, standing by itself, this species of presumption, except in cases of receiving stolen goods, is too slender to support a conviction."

It is probable, or even possible, that some other person than the accused did the killing. Is it, or not, true that other persons threatened, and had the same motive for kill- the deceased? This last question is the one defendant's counsel had in view when they offered to show by witnesses that State witness Wyers had made threats to take the life of deceased. It must be remembered that but one witness for the State testifies as to threats made by accused to kill deceased; and the last threat heard, by witness Wyers, was about a week before Heaton was killed. In view of the peculiar circumstances of this case, we submit that the court erred in excluding testimony of defendant going to show that the prosecuting witness, Wyers, had the same motive, and in fact did threaten to kill deceased. The rule laid down by Mr. Wharton applies here with more than ordinary force: "Another person, really desirous of commit-

ting the offence, may have profited by the occasion of the threats [of accused] to avert suspicion from himself.'' The learned judge of the court below, in attaching his certificate of approval to the bill of exceptions taken to the ruling of the court excluding the testimony of witnesses as to threats made by the witness Wyers, gives as a reason for his ruling, the decision of this court in the case of *Boothe* v. *The State*, 4 Texas Ct. App. 202. See bills of exception Nos. 3 and 4. The case of *Boothe* v. *The State* does not decide the question raised by the bills of exception. In the case cited, the defendant, Boothe, offered to prove that other, or third parties, had threatened to kill the deceased, Reeves. In the case at bar, the defendant offered to prove that the prosecuting witness, Wyers, had made threats to kill the deceased, Heaton, and had the same, or even a greater motive for the act than the defendant, for the reason that Heaton was, at the time he was killed, prosecuting the witness Wyers for theft of horses. It will be recollected that the witness Wyers, on his cross-examination, had stated that he didn't recollect that he had threatened to kill Heaton. Having so stated, it certainly was, if for no other purpose, competent to show these threats, for the purpose of impeaching the witness. That a witness may be impeached in this way, we apprehend, will not be controverted. And for the same reason the court erred in excluding the testimony of Caroline Church. It will be seen, by reference to the testimony of George Lowe, that he stated that he had had no conversation with George Wyers about the case. The court below excluded the testimony of the witness Church on the ground that no predicate for the introduction of such testimony had been laid. We submit, with all due respect, that, in substance, the statement of facts shows the contrary. In this connection, we invite the attention of this court to the affidavit of the witness George Lowe, attached to defendant's motion for new trial.

Bill of exception No. 6 presents the same question as to

threats made by the witness Wyers, but in a different form. If A. offers B. $100 to kill C., is it, or not, a threat upon the part of A. to take the life of C.? We submit that it is a threat on the part of A., with all the elements of malice. It will be seen from the testimony of the witness Wyers that he stated he never made any threats against Heaton. We submit, then, that the testimony of Reno was competent to contradict Wyers.

The charge of the court on the question of *alibi* is not sufficiently full, and does not explain the full meaning and legal effect of a defence of that kind. *Boothe* v. *The State*, 4 Texas Ct. App. 213.

The evidence is not sufficient to support a conviction for murder. It will be seen by an inspection of the statement of facts that the evidence is all circumstantial, and of a character uncertain, and not conclusive of any fact going to show the guilt of the accused.

Evidence is divided into positive and presumptive. Positive evidence is where the witness swears distinctly to the commission of the act or crime which forms the subject of the trial. Presumptive evidence is that conclusion which the mind reaches from circumstances, or minor facts, as sworn to by witnesses. But no presumption can be made but on a fact already known and ascertained. To illustrate: if the stains of blood on the clothing of the accused immediately after the murder are to be presumptive evidence of his guilt, the fact of the stains being occasioned by blood must be first distinctly ascertained; the one presumption cannot be made to aid the other. The stains are not to be presumed from blood because the accused is presumed to have been the murderer; nor, on the other hand, is he to be believed the murderer because the stains are believed to be from blood.

Circumstances, it is said, cannot lie. This is very true; but witnesses can! From whom do we obtain circumstances? Certainly from the same source that you obtain

evidence of a positive nature. Thus, we are liable to two deceptions: first, in the tale told by the witness; and, secondly, in our own application of the circumstances. Where a fact is positively sworn to by witnesses, the conclusion or inference to be drawn from it is generally obvious. But when the inference is to be drawn from a long train of circumstances, it is a matter of judgment; it is an exercise of the understanding; and, as all men do not understand alike, very opposite conclusions are sometimes drawn from the same shades of probability.

No writer, and, so far as our investigation has extended, no court, has ever held the absurd position that circumstances cannot lie, or that conjectural proof is superior to that of positive and direct proof of the act or crime. It is true, the authorities in some instances have held, in effect, that circumstantial evidence is more satisfactory than evidence of a positive nature; but farther than this the authorities have not ventured; and whilst it may be said that circumstantial evidence, in some cases, is more satisfactory than evidence of a positive nature, yet at the same time circumstances are more liable to deceive, or lead to deception. Reason and experience teaches us that it is more difficult to controvert or rebut a train of circumstantial evidence than evidence of a different kind or nature; for how is it possible for a prisoner, altogether innocent of the charge, to controvert circumstances or an account of events with which he is entirely unacquainted. If the accused be ignorant of legal proceedings, and ignorant of the circumstances sought to be established as evidence against him, he cannot easily confute the chain of circumstances. Our experience teaches us that a premeditated story is always so made up, so arranged in all its details, as to bear the appearance of consistency. Men will believe a probable falsehood rather than a singular truth. It frequently happens that the accused is not apprised of the evidence intended to be produced against him, thereby enhancing the difficulties

surrounding him, and making his defence more difficult; for a man can only refute a false story by being acquainted with some part of it.

" It should always be kept in mind that circumstantial evidence is merely supplemental, and is only resorted to from the want of original and direct proof.   It never can be said that what is secondary is equal to that which is original, — the thing substituted equal to that which it is meant to supply."    1 Gilbert on Ev. 142.

Mr. Phillips, in his work on Evidence, says: " It seems desirable that some inchoate act, approaching to the crime, should be proved on the prisoner, and that he should not be convicted on general appearances, — such as from being found in a certain situation.   Strong appearances, without any act proved against the prisoner, have too often turned out unfounded."

We submit, in all candor, that the testimony on behalf of the State proves but two substantive facts, viz.: First, that Heaton was killed on the day charged in the indictment; and, second, the killing was done by a negro, or an unknown party.   Heaton, before he died, said it was a negro; and it is in proof that he knew the accused well; and he certainly would have recognized the accused, had he been the guilty party.   We feel assured that this court will attach but little importance to the testimony of George Lowe, when read in the light of his affidavit attached to defendant's motion for new trial.   We come, now, to consider the evidence on behalf of the accused.   The witnesses Dial and Green say, having heard that defendant was suspicioned as the party who killed Heaton, and that he was blacked, examined him closely, for the purpose, if possible, of discovering evidence of blacking about his face and neck.   The witness Calvert also made a partial examination; and neither of these witnesses could discover the slightest evidence of blacking on the person of the accused. It will be remembered that this examination took place

before the witnesses Read and Welle had met the defendant. The witness Grant states that accused stayed all night with him, after Heaton was killed, and washed his face in a clean bowl, and used a clean towel; and that he (witness) used the same bowl and towel, and discovered no evidences of blacking. The defendant (says the witness) slept soundly all night, — no excitement about him, — and left for Marlin very early next morning, and returned about twelve or one o'clock. Here we have four witnesses, — two or three of them made a close examination for blacking, — against the witnesses Read and Welle; and, in this connection, we desire to call the attention of your honors particularly to the conduct of the accused next morning after the killing of Heaton, and at a time when he must have known that the whole community would be excited and the public pulse at fever-heat. Do we find him evading and hiding away from the vigilant eyes of the law-officer and his posse, or do we find him visiting Marlin, the county-seat? When the witness Dial told him that the dogs were on his trail, does he flee, like a guilty man, or does he come down the street, facing the sheriff and his posse, surrounded as they were with their dogs? Coolly, calmly, and quietly the accused transacts his business, and then openly returns to his home. In all this, do we find any evidences of guilt? Is it reasonable, or probable, that the accused would have undertaken the murder of deceased in the presence of his nephew, George Lowe, when opportunities for committing the act had frequently presented themselves, when no eye save that of his God could have witnessed the bloody deed? Does it appear reasonable that the accused would make known his intention to kill Heaton to the witness Wyers, or to any one else, if he in fact contemplated the act? Reason and the experience of man are certainly to the contrary. If threats were, in fact, made, why is it that the witness Wyers did not communicate these threats to the deceased, thereby placing him on his guard? Reason and experience

teach us that, when men contemplate violating the law, they make no confidants, but seek concealment. However, there are some exceptions to this rule. In some instances persons have made known their purposes; but they are few and rare.

The defendant has proven by Mrs. Read, and by Gross and Wallace, that, late in the evening of the day on which Heaton was killed, he was near Perry Station, on the railroad; Mrs. Read says, seven or eight miles from Walker's Tank; Gross did not know the distance, but knew it was several miles; Wallace did not know the distance. If the statements of these witnesses be true, then an *alibi* was clearly proven. The State will, no doubt, assume that it has successfully impeached Mrs. Read and Wallace. We submit that the record shows the contrary. The witness Gross states that he saw the accused near Perry Station on the evening Heaton was killed, and that he also saw Mrs. Read near there. Now, Mrs. Read is corroborated by the testimony of Gross, who has not been impeached. Wallace says he saw accused on the same evening, three or four miles from Marlin, and that Perry Station is seven or eight miles from Marlin, showing conclusively, as we understand the facts, that the witness Wallace saw the defendant after he had passed the witnesses Read and Gross. The impeaching witnesses, Elam, Brookshire, and Crawford, go no further than the bare statement that the character of Wallace and Read for truth and veracity is bad; neither one of them, it seems, was willing to risk a statement that they would not believe them on oath. Persons may be loose in statements of and concerning ordinary matters and things, but when placed upon the witness-stand, and under the solemnity of an oath, would be as careful to state nothing but the truth as those called to impeach them. Mrs. Read being corroborated, we submit that the State has entirely failed in its efforts to impeach her, and that the *alibi* was sufficiently proven.

We submit that, under the peculiar circumstances ·of this case, and the nature and character of the evidence on the part of the State, and the showing made by the accused, the court below should have granted him a new trial. The laws of the land should be vigorously enforced, and offenders punished when detected in the commission of crime, but no one should be condemned to suffer the extreme penalty of the law except upon clear, full, and sufficient proof of guilt.

Respectfully submitted, with the request that, for errors assigned, the cause be reversed, and remanded for a new trial.

*Thomas Ball*, Assistant Attorney-General, for the State.

WINKLER, J. This is an appeal from a conviction for murder in the first degree.

Mrs. Eliza Walker, the mother of the appellant, who lived on Brushy Creek, in Falls County, Texas, and about a quarter of a mile from Walker's Tank, also in Falls County, who had been a widow about twenty years, was the owner of a stock of cattle and horses, which she had owned eight or nine years, and knew of no one claiming them adversely to her; but some of her children had been talking about suing for their father's part. The appellant and Matt Walker were setting up a claim. Mrs. Walker sold out her cattle and some of her horses, — all but a few of both cattle and horses that ran about home, — to one George Heaton, who lived about two miles from her.

Heaton commenced gathering the stock on April 9, 1878. George Walker a son, and George Lowe, a grandson of Mrs. Walker were assisting in gathering the stock. Walker's Tank was situated about one-quarter of a mile from Mrs. Walker's residence, in an open country, and near enough that, when the tank is full, the water in it can be seen from the house. On the day Heaton commenced

gathering the stock (April 9, 1878), in the afternoon, when he was about half a mile from Mrs. Walker's house and about one hundred and fifty yards from the tank, riding one horse and leading another, some one rode rapidly up behind him, and shot him with a pistol in the back. His horse plunged, and he fell to the ground and expired, but not until he had called to George Lowe, who was near by, and went to him; and not until George Walker had gone rapidly on horseback from the house to where he had fallen and was lying on the ground. This is a condensed statement from the testimony of some of the witnesses.

At the September term, 1878, of the District Court of Falls County the appellant was indicted for the murder of Heaton, and one John Walker, Sr., an uncle of the defendant, was indicted as an accessory thereto; and the appellant was arraigned, and entered the plea of not guilty. On March 19, 1879, the appellant was tried and convicted of murder in the first degree, and adjudged to suffer the penalty affixed by law for the crime of which he had been convicted. A motion for a new trial was made, and, being overruled, this appeal is prosecuted; and appellant has assigned errors as follows: —

1. The court erred in forcing the defendant to announce at the time said cause was called for trial, because of the reasons set out in his bill of exceptions No. 1. 2. The court erred in excluding the testimony of witnesses, as shown by bills of exception from two to seven, inclusive. 3. The court erred in its charge, in this: the charge does not present the law applicable to the case as fully as it should have done. 4. The verdict of the jury is contrary to the law and the evidence. 5. The judgment of the court is contrary to the law. 6. The court erred in overruling the defendant's motion for a new trial.

The matter complained of in the first error assigned, as set out in the accompanying bill of exceptions, may be summar-

ized as follows : A special *venire facias* had been ordered and issued for sixty persons to serve as petit jurors on the trial of the case.    By the return of the sheriff it is shown that but twenty-nine of the sixty had been summoned, the return further stating that all the others whose names were on the special *venire* were "not found in the county."    There is no objection taken to the  special *venire facias*, nor to the manner of service, nor to the  return of the sheriff, nor yet to the manner of service of the names of those who were summoned, upon the defendant.    The naked question, then, is, did the court err in requiring the defendant to announce, there being but  twenty-nine members of the special *venire* summoned, from which to select a jury for the trial?

The Code provides that  "where there is pending, in any District Court, a criminal action for a capital offence, the district attorney may, at any time after indictment found, on motion, obtain an order for summoning any number of persons, — not less than thirty-six nor more than sixty, as may be deemed advisable, — from whom the jury for the trial of such capital case is to be selected."    Code Cr. Proc., art. 548.    The clerk shall issue a writ commanding the sheriff to summon the number of persons named in the order.    Id., art. 549.    The clerk, immediately upon receiving a list of the names of the persons summoned under a special *venire facias*, shall make a copy thereof, and shall furnish the same to the sheriff, who shall deliver such copy (of the names of persons summoned) to the defendant. Id., art. 553.    And it is from the list of persons summoned, and not from the names upon the writ, that the jury is to be selected.

The object of the law in providing a special *venire* is believed to be to insure to the defendant accused of, and about to be tried for, a capital felony a fair and impartial trial, and to afford such an one proper means of ascertaining that the persons from whom a jury is to be selected possess the proper qualifications, and are not under the influence of

any bias or prejudice; and, therefore, he is not by law entitled to have the whole number ordered upon the special *venire*, nor, indeed, the whole number served, to be present when the jury is to be formed; so that there be present a number sufficient to secure a fair jury, the object of the law would be complied with, and he would have no just grounds to ask for more than this. If the number was not sufficient for this purpose, or if the number present should become exhausted, from any cause, before the jury shall be completed, the deficiency should be completed in the manner prescribed by law. In the absence of any thing being shown to the contrary, we are of opinion the court did not err in requiring the defendant to announce under the state of case stated in the bill of exceptions. It is not shown any where in the transcript that any injury resulted, or was likely to result, to the defendant from the ruling of the court. What we have said on this subject, however, must be held in the future as in subordination to the provisions of the Revised Code, which, when it goes into effect, will furnish the rules in such cases, and those rules will be found in the Revised Code of Criminal Procedure, arts. 605–617, and in legislation subsequent thereto, if any.

By reference to the several bills of exception referred to in the second assignment of errors, it will be seen that the State's witness George Wyers had stated, on cross-examination, that he was friendly to the deceased, and did not think he had made any threat against him. Defendant's counsel then asked the witness whether, or not, the deceased was prosecuting him (the witness) for theft of horses. The question was objected to on the part of the State, and the objection was sustained. 2. The defendant offered a witness, and asked him whether, or not, he (the witness) had heard George Wyers threaten to kill the deceased; to which the counsel for the State objected, and the court sustained the objection. The matter in the third bill of exceptions is the same as that of the second, the only difference being

that another witness was offered to prove the same fact. 5. Defendant introduced a witness in his behalf, and asked the witness whether, or not, she had heard George Lowe, a State's witness, say that George Wyers, another State's witness, had told him (Lowe) what to say when examined as a witness on the trial; which being excepted to, the objection was sustained, on the ground, as stated in the bill, that no predicate had been laid for the testimony by previous inquiry as to such statements of the witnesses Lowe and Wyers on their examination. The sixth presents the same legal proposition as the fifth. The seventh is the following: " The defendant introduced a witness, who testified that, a day or two after the killing, he (the witness) saw a negro named Ben, in McLennan County, eight or nine miles from where the homicide was committed, who had two pistols, and witness purchased one, etc. Defendant then asked the witness what Ben said when he purchased the pistol from him." On objection, the court refused to permit the question to be answered.

The questions raised on this assignment of error were: 1. Was it competent for the defendant to prove that one of the State's witnesses had threatened to take the life of the deceased prior to the killing? 2. Had the proper predicate been laid for contradicting or impeaching the two State's witnesses Wyers and Lowe, mentioned in bills of exception five and six. The subject of the seventh needs no further notice than to say the testimony was too clearly inadmissible to admit of argument.

The first question must be answered in the negative. It is not admissible for one on trial for a homicide to prove that another person had previously threatened to take the life of the deceased. This precise question was settled in the case of *Boothe* v. *The State*, 4 Texas Ct. App. 202. The issue of the trial was the guilt or innocence of the defendant on trial. Evidence is admissible if it *tends* to prove the issue, or constitutes a link in the chain of proof; and

this seems to be the limit, and excludes all evidence of *collateral facts*, or those which are incapable of affording any reasonable presumption or inference as to the principal fact or matter in dispute; and for the good reason stated for the rule by Mr. Greenleaf, that such evidence tends to draw away the minds of the jury from the point in issue, and to excite prejudice, and mislead them. 1 Greenl. on Ev., sects. 51, 52. The case does not involve the questions of principals, nor is there any feature of the case which makes the defendant's guilt depend upon the conduct of the witness Wyers.

As to the second proposition: Whilst it is one of the recognized modes of impeaching the credit of a witness to show, by proof, that he has made statements out of court contrary to what he has testified at the trial, yet it is only in such matters as are relevant to the issue that a witness can be contradicted; and it is the general rule that this can only be done — in case of verbal statements — by directing the attention of the witness to the time, and the place, and the person to whom he has made the supposed contradictory statements. 1 Greenl. on Ev., sect. 462. We are of opinion the defendant did not bring himself within the rule, either by proper interrogation of the witnesses whose testimony he proposed to discredit, or by showing the materiality of the supposed contradiction.

The third supposed error is, in effect, that the charge of the court did not fully present the law of the case. By the brief of counsel, the supposed defect in the charge is applied to the question of *alibi*, and it is argued that the charge does not explain the full meaning and legal effect of this defence.

The ninth paragraph of the charge is as follows: "Amongst other defences set up by the defendant is what is known in legal phraseology as an *alibi*; that is, that if George Heaton was killed as alleged, that the defendant was, at the time of such killing, at another and different place

from that at which such killing was done, and, therefore, was not and could not have been the person who killed Heaton, if he was killed. Now, if the evidence raises in your minds a reasonable doubt as to the presence of the defendant at the place where George Heaton was killed (if killed), at the time of such killing, you will find him not guilty." Counsel cite *Boothe* v. *The State*, 4 Texas Ct. App. 202, in support of the position that the charge is defective. To our mind, the authority cited does not support the proposition. The charge objected to comes up to the requirements of a charge on *alibi*, as laid down in Boothe's case, especially when read in connection with what follows the paragraph complained of.

That the verdict and judgment are contrary to the law and the evidence are positions not supported by the record. It is true that the precise question, who it was that rushed up behind the deceased and fired the fatal shot in his back, depends upon circumstantial evidence, and to which we shall have occasion to recur hereafter. There is no room for controversy that the defendant was so situated as to have enabled him to place himself in position to do the deed, or that he entertained malice against the deceased, and had repeatedly threatened to take his life; and although the mother of the Walker family had endeavored to reconcile him and compromise the trouble about the property, he had refused to be conciliated; and, the law having been correctly charged by the judge, we are unable to say that the verdict and judgment are contrary to the law and the testimony.

There remains to be considered the sixth and last error assigned, to wit: that the court erred in overruling the defendant's motion for a new trial. This subject presents two important features: first, the evidence of the identity of the defendant; and, second, the alleged newly discovered evidence disclosed in the affidavits filed in support of the motion for a new trial.

The tangible points in the evidence of identity of the defendant are about these: George Walker, a brother of the defendant, says he saw the deceased at the herd; some one trotted up behind him and shot him. Witness was on the gallery, in open view, and saw Heaton fall from his horse when shot. The party who did the shooting galloped off east; he was riding a dark-colored horse. Witness went to deceased, who was on the ground, lying on his side. He lived about fifteen minutes after witness reached him, and then died. He was shot in the back, — had a bullet-hole in his back. George Lowe was with the herd, and about fifty or one hundred yards from Heaton when he was shot. Witness said, on cross-examination, that Heaton was killed about four o'clock, P. M., and witness saw no one there except the assailant and Heaton. He could not tell the color of the person who did the shooting, and asked the deceased who did it; " he said it was a negro, riding a black horse, and he did not know him. When I first got to Heaton, he reached out his hand to me and said, ' George, I am shot; a negro did it.' " Abner Walker lived in the same neighborhood, and Heaton knew him well. The defendant owned a black horse; witness knew him and the horse well. On reëxamination, the witness said: " I saw the person who shot Heaton; Heaton's back was towards the party who did the shooting. Didn't see Heaton look back. Heaton's horse jumped when the pistol fired, and he fell at once. I did not see Ab Walker that day. I was looking at the party firing." Another witness testified that, about two weeks before Heaton was killed, Heaton had gone to town, and defendant said he was going to kill him that evening; and said that the witness ought to help him (the defendant), because his (witness's) wife was equally interested. Witness declined. About three weeks before that, the defendant proposed to him (witness) that, if he (the witness) would get a negro to kill Heaton, he (the defendant) would then kill the negro. Witness says

he declined. Speaking of the time of the killing, he states that the defendant wore his mustache and a little goatee at the time.

We extract from the testimony of an important witness for the State, George Lowe, on whose testimony reliance is placed to identify the appellant as the person who shot the deceased, giving his testimony in the language of the statement of facts: "When Heaton was killed, I lived with my grandmother, Mrs. Walker. Defendant is my uncle. I was herding horses for Heaton on the day he was killed; they were the horses he bought from Mrs. Walker. I was employed by Heaton, was herding about one quarter or one-half mile from Mrs. Walker's, and about one hundred yards from the tank. Heaton was coming to the herd, riding along toward me, leading one horse. Some person ran up behind him and shot him. His (Heaton's) horse pitched and threw him off. Heaton called me, and I went to him; he was lying down. He was alive when I left him; I went to the house. Uncle George Walker came to where Heaton was. The assailant was riding a brown horse; I think I had seen him before; he looked like old John Walker's brown mare. John Walker is uncle of defendant. The man who killed Heaton was black; had mustache and goatee. His beard was about the size of defendant's; don't know exactly how he wore it. The man that killed Heaton was about the size of defendant; he had on a black hat or white hat; don't remember which. Next time I saw defendant he had mustache and goatee, just as he had when Heaton was shot. I thought I saw Abner come by me about eleven o'clock the morning Heaton was killed. It looked like the same man who killed Heaton. Abner lives about one and one-half miles from the tank. The man that shot Heaton rode like Abner Walker, — looked like him; he shot him with a nickle-plated pistol. (Cross-examined.) The man that killed Heaton had on dark clothes. Saw him before he shot. It is an open country about the tank; some brush

about a mile from Big Creek. I saw Heaton before on that day, at Mrs. Walker's, in the morning; don't know the time; saw him nowhere else, only when he was killed. The man who killed Heaton went toward Big Creek, where he came from. Heaton was killed between four o'clock and sundown; the sun was between two and three hours high. It was a white man who shot Heaton, but he was blacked; he was right black, from putting blacking on him. * * * The man that killed Heaton I took to be the same that passed me in the morning. He was black when he passed me in the morning. I was about one hundred yards from the man that passed me in the morning. Heaton's horse pitched around before he fell off. I went to Heaton and asked him what was the matter, and he said he was shot; said nothing else to me. I did not hear George Walker ask Heaton who shot him. I have not conversed with George Wyers about this case. The person who killed Heaton was about ten steps from him (Heaton) when he fired, and was riding in a lope."

Another witness, fixing the time at about nine o'clock on the morning after the killing, in the town of Marlin, says the defendant stopped near him about thirty seconds; and says: "I saw a dark, dirty, greasy appearance around about his neck, darker than he is. Defendant is a dark-skinned man. I have been engaged in blacking for amusement, when a boy, and have been blacked. The appearance was as if it was blacking, not well washed off." This witness said, on cross-examination, that he was seventy-one years of age, and could not read without glasses, but could see as well as ever at a little distance. He says defendant went immediately to Welle's shop.

The witness Welle testified that, on the morning after the killing, the defendant was at his store in Marlin, when a party who had gone to the scene of the homicide arrived in town, and were coming down by Read's Hotel, towards witness's store. We here quote from the testimony of this

witness, as found in the statement of facts : "Defendant, as these parties came in sight, stepped into my store and asked for a drink of whiskey, and drank it. I turned and looked at the man, and turned back ; he was taking another drink ; he stepped out at the back door, remained a few minutes, and came in and took a third drink. He then asked if I had flour. I showed him some in a dipper ; he took some in his hands and rubbed it over the back of his hands, twisting his hands over each other. He asked me if I had better flour. I cut open a sack, and defendant took up some flour and rubbed it over his face. He looked excited ; he bought no flour that day." The testimony on this branch of the case is conflicting, and in many respects irreconcilably contradictory ; and almost every proposition attempted to be proved by the State has been attempted to be disproved by the defendant, and the credibility of the witnesses attacked and attempted to be impeached.

In such a state of the evidence, the law makes it the duty of the jury to determine the weight of the testimony and the credibility of the witnesses who have testified before them. On this branch of the investigation, the instructions given to the jury properly informed them as to their duties and powers under the law, as follows : "You are the sole and exclusive judges of the credibility of each and all of the witnesses, and the weight to be given to their testimony, and you will give such credit to them, and such weight to the evidence adduced before you, as in your judgment they should have. When testimony is offered for the purpose of impeaching witnesses, either by attacking their general reputation for truth and veracity, or by seeking to show that they have made statements elsewhere inconsistent or in conflict with those made on the stand, you are still the judges of the credibility of all the witnesses, — of those whose testimony may be thus attacked, and of those who are offered to impeach them, — and will, in view of all the evidence, give to them, and each of them, such credit, and

to their evidence such weight, as in your judgment they should have.'' On the subject of the conclusiveness of circumstantial evidence in order to warrant a conviction, the jury were instructed as follows: '' If, on consideration of the evidence, there is any reasonable hypothesis consistent with the facts proved to your satisfaction, and inconsistent with the guilt of the defendant, he should be acquitted.''

But it is insisted that a new trial should have been granted on account of important testimony discovered since the trial; and the defendant has filed his own affidavit, and those of Catharine Walker, Caroline Church, and George Lowe supporting it.

Two of the affiants testified on the trial, — one for the State and one for the defendant; the other did not testify. The main features of the testimony were, first, to show ill-feeling on the part of the State's witness Wyers toward the deceased, and an interest in procuring the conviction of the defendant, and also to contradict the State's witness Lowe, who identified the defendant as the perpetrator of the deed. We have already seen that it would not be a good defence for the accused to prove threats or ill-will on the part of another towards the deceased. A new trial will not be granted in order to procure testimony to impeach a witness. The affidavits of the persons who are offered in support of the motion do not bring the defendant within the rules of law which authorize the granting of new trials on account of newly discovered testimony, nor show that the supposed new testimony would be likely to change the verdict on another trial. If the proof had shown, or should show, that the defendant had attempted to hire an assassin to take the life of the deceased, and then himself kill the hired assassin, the tendency would be rather to show a more depraved mind and heart than the testimony adduced on the trial. Taking into consideration the facts surrounding this unfortunate transaction, — that the witnesses were, many of them, relatives of the defendant and of each other, and that the

parties mostly lived in the same vicinity, and that upon the testimony, under appropriate instructions from the judge, the jury found the appellant guilty, and the court before whom the witnesses testified has refused to set aside the verdict, and because we are unable to say, from an inspection of the whole of the testimony, that it is not sufficient to support the finding of the jury, — we see no error in refusing a new trial, although the testimony is, in some important features, circumstantial.

From a careful examination of the whole case, as disclosed by the record, and in the light of the able brief of counsel for the appellant, we find no such error in the proceedings as would, in law, authorize a reversal of the judgment, and it is affirmed.

*Affirmed.*